Filed 12/9/21  P. v. Kim CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B309035 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA402937) |
| v. | |
| HYO KUN KIM, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mildred Escobedo, Judge.  Reversed with directions.

Christopher Lionel Haberman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Paul M. Roadarmel, Jr. and Steven D. Mathews, Supervising Deputies Attorney General, for Plaintiff and Respondent.

———————————

Hyo Kun Kim appeals from the trial court's order denying his motion under Penal Code sections 1016.5 and 1473.7 to vacate his 2013 conviction for assault with a deadly weapon.[1] Kim has been a legal permanent resident of the United States since 1979. But his conviction subjects him to mandatory deportation to South Korea.

At the time of his no contest plea, Kim expressed confusion about the immigration consequences of his plea. The court's response suggested Kim might be able to avoid deportation. Plus, Kim suffered from psychosis, had been diagnosed with schizophrenia and was taking anti-psychotic and mood stabilizing medications.

We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Underlying Offense*

On September 17, 2012, Kim entered a coffee shop and asked for free coffee. The owner obliged. Kim asked for a loan, which the owner refused. The owner asked the security guard to ask Kim to leave. Kim refused. The security guard, feeling threatened, pepper-sprayed Kim and attempted to handcuff him. A struggle ensued, and Kim cut the security guard's hand with a knife. The cut required approximately 20 stitches.[2]

The People charged Kim with one count of assault with a deadly weapon (§ 245, subd. (a)(1)) and alleged he inflicted great bodily injury (§ 12022.7, subd. (a)).

---

[1]      Undesignated statutory references are to the Penal Code.

[2]      Facts taken from the probation officer's preconviction report.

B.    *Kim's Plea and Conviction*

On February 7, 2013, the day of trial, defense counsel told the trial court that Kim wanted to change his plea to the charge in an open plea to the court.[3] The court told Kim if he pleaded to the charge, the court would sentence him to two years, given his lack of criminal record and "some unusual circumstances." The People had offered Kim a plea agreement for three years, striking the great bodily injury enhancement.

The court began by addressing the immigration consequences of the plea, noting they were a concern of Kim's. The court explained, "[I]f you're found guilty or no contest, you will have the consequences – will – not maybe – but will have the consequences of deportation – you know what deportation is? – that's where they'll send you back to Korea – exclusion of admission to the United States, meaning you can't be admitted to the United States – or denial of naturalization, meaning you can't become a citizen and some other rights, pursuant to the laws of the United States. I'm explaining it a little more than I'm required to. Do you understand that?" Kim responded, "Your Honor, I do understand it, but then I guess I'm going to have to say I'm going to have to go with the trial, because that's going to affect my immigration status."

Kim confirmed his desire to have a jury trial, and the court began jury selection.

After the lunch break, defense counsel told the court that Kim again had changed his mind and wanted to enter a plea of no contest. The court advised Kim of his constitutional rights and took waivers of them. The court explained that if Kim went to trial, the maximum sentence Kim faced was seven years but that

---

[3]    Judge Clifford L. Klein.

3

"I'm not saying I'll give you the seven years but that's the worse that can happen to you.  Of course you could win."  The court revisited the immigration consequences of the plea, stating, "I read you your immigration consequences before, I'm gonna read it again because I know you're very concerned about that.  If you're not a citizen you're advised that a conviction for this offense, meaning this crime will have the consequences of deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States; do you understand that?"  Kim responded, "Yes."

The court asked Kim if he had discussed with his counsel the charge, his defenses and the consequences of his plea, including immigration consequences.  Kim said, "I did but I'm a little unclear about all that."  The court asked, "What are you unclear about?"  Kim explained, "Um, well, I was, I went to school ever since I was in first grade and I can't understand why I would be deported."  The court responded, "I'm not here to explain immigration laws; I'm not an immigration lawyer.  Yesterday I had an immigration lawyer in court, I asked him a question of something I didn't think was fair but that's up to the immigration authorities I just have to tell you; okay."  The court went on to say, "If you want to argue with them you should be allowed to stay here you can make that argument but I don't have any control over that.  I've told you what, what the law says I have to tell you.  Okay.  Do you understand that?"  Kim responded, "Yes."

Before taking his plea, the court asked Kim if he wanted to talk to his counsel.  Kim did not respond; instead, defense counsel responded, "Thank you, Your Honor."  Kim then entered a plea of no contest under *People v. West* (1970) 3 Cal.3d 595, to one count of assault with a deadly weapon (§ 245, subd. (a)(1)) and admitted

4

the great bodily injury special allegation (§ 12022.7, subd. (a).)[4] The court asked defense counsel if he joined in Kim's waivers and plea and if he was satisfied Kim understood what he just did given his "yellow shirt."[5] Defense counsel responded affirmatively.

The court struck the great bodily injury special allegation for sentencing. The court explained, "there were mitigating circumstances here with the defendant [who] lacked the prior record." The court said that "there were certain mental health aspects to this," including "serious issues in his past," and that if the people at the coffee shop "had known the true situation maybe this could have been avoided." The court sentenced Kim to two years, noting "were he to have certain psychiatric behaviors in state prison," he could "serve even longer."

At defense counsel's request, the court included in Kim's prison packet a psychiatric report prepared by Dr. Rothberg on Kim's competency to stand trial. The court also "strongly recommend[ed]" Kim be evaluated for housing in a mental health treatment facility and receive mental health treatment.

---

[4]     Assault with a deadly weapon (§ 245, subd. (a)(1)) is a crime of violence under federal law, and when resulting in a sentence longer than one year, it becomes an aggravated felony, which is a deportable offense under federal immigration law. (8 U.S.C. § 1101, subd. (a)(43)(F); 18 U.S.C. § 16, subd. (a).)

[5]     The "yellow shirt" refers to the fact that Kim was being held at the psychiatric hospital facility of the Los Angeles County Twin Towers Correctional Center.

C.    *Kim's Motion To Vacate*

On March 19, 2020, Kim moved to vacate his plea under sections 1016.5 and 1473.7. Kim argued that his mental illness prohibited him from meaningfully understanding the immigration consequences of his plea, and that the trial court erred and his defense counsel was ineffective in proceeding with the plea after Kim expressed confusion about immigration consequences.

In addition to the transcripts from his plea hearing, Kim submitted documents created on or around the time of his plea, including medical reports from the Los Angeles County Sheriff's Department from September 25, 2012, to February 8, 2013; defense counsel's request for a competency evaluation and Dr. Rothberg's November 30, 2012, psychiatric evaluation; and defense counsel's February 7, 2013, notes about Kim's case. Kim also submitted a more recent psychiatric assessment and declarations from his treating physician and immigration attorney.

1.    *Medical Reports*

After his arrest, Kim was housed at the psychiatric hospital unit of the Los Angeles Sheriff's Department Twin Towers Correctional Facility. Kim began treatment in the jail facility on the day of his arraignment. He was prescribed medications to treat his psychosis, which were modified during his detention. On October 15, 2012, medical staff noted Kim's speech "derails and becomes disorganized on elaboration," and he expressed "paranoid themes of being watched by persons on the outside." Kim experienced "bizarre, paranoid delusions" about people breaking into his home and plotting against him, about cockroaches hatching more eggs if they saw him take his

6

medication, and about someone attacking Kim who "looked familiar" but whom he could not identify because of the attacker's plastic surgery. Kim also experienced audio and visual hallucinations from October 2012 through January 2013. Kim complained of bleeding gums, which the staff discovered resulted from Kim brushing his teeth with a toothbrush he found in a can containing a floor-cleaning chemical. Medical staff wrote that Kim's behavior was unpredictable and that he demonstrated poor judgment and impulse control.

On January 30, 2013, medical staff noted that Kim's psychotic symptoms were decreasing and that he claimed to feel better and denied having hallucinations. On February 6, 2013, the day before he changed his plea, medical staff reported Kim did not show any bizarre behavior or psychotic symptoms. On February 11, four days after he entered his plea, medical staff described Kim's speech as "at times circumstantial w/nonsequential responses."

2. *Defense Counsel's Request for Psychiatric Evaluation and Dr. Rothberg's Report*

On October 25, 2012, defense counsel wrote to Dr. Rothberg requesting a psychiatric evaluation of Kim. Counsel explained Kim's background, including that he was once a conservatee of the Public Guardian and received social security benefits for mental illness. Counsel explained Kim had been living with his mother, and after she moved to a convalescent home, he was unable to care for himself and resorted to taking food from local restaurants for a few weeks. Counsel also explained Kim told him he carried a knife because "he believes Syrian terrorists are out to get him because they know his grandfather was a Coronel

7

[sic] in the ROK Army during the Korean War."[6] Concerning the potential disposition of the case, counsel said Kim was "open to a hospital setting as an alternative to state prison, but will not agree to any resolution that would involve him being found guilty" because he believed a private security guard did not have the right to arrest him. Kim also told counsel, "he wants to plead no contest, and then immediately appeal because he is not guilty." Counsel could not convince Kim that "his proposed solution was not an option."

Dr. Rothberg interviewed Kim and prepared a psychiatric report on November 30, 2012, assessing Kim's competency to stand trial and providing recommendations for disposition. Kim described the incident leading to his arrest, stating "he was afraid of the security guard," "was not sure he was actually a security guard because sometimes people impersonate them," and "thought he was going to be kidnapped . . . so he acted in self-defense." Kim explained, "he carrie[d] a knife because he had been assaulted in Anaheim in the past and is always fearful." Dr. Rothberg noted Kim was aware of what a trial was and "believe[d] he would do about six or twelve months in a hospital." Dr. Rothberg concluded Kim "understands the nature and the purpose of the proceedings" and "appear[ed] to be marginally competent to stand trial, and though his competency is less than optimal it is probably adequate to proceed." Dr. Rothberg believed that Kim had "a very significant underlying mental disorder" and that he would be a "suitable candidate for a diversion into a mental health program, but given his low level of

---

[6] ROK likely refers to the Republic of Korea. The ROK Army is also known as the Republic of Korea Army or the South Korean Army.

functioning, he needs to be in a structured and preferably locked environment."

3. *Defense Counsel's Notes About Kim's Case*

Defense counsel's notes dated February 7, 2013, summarized Kim's case proceedings. Counsel characterized Kim as "borderline competent but knows what is going on." Regarding immigration consequences, counsel wrote Kim "has residency but advised that he should expect to be deported despite long term US residence." Based on counsel's investigation, there were no favorable witnesses. Counsel said Kim "understands issues esp self defense. Understands & waives rts." Counsel noted the circumstances leading up to the incident appear to be that Kim was being cared for by his mother, who entered a rest home, and Kim "was unable to care for self. [H]e relied on hand outs & theft from local businesses."

4. *Asian Pacific Counseling and Treatment Centers' Psychiatric Assessment*

On May 23, 2018, Asian Pacific Counseling and Treatment Centers prepared a psychiatric assessment of Kim. The assessment confirmed Kim had been diagnosed with and continued to suffer from schizophrenia, which he managed through medication. The assessment noted Kim had served his prison sentence in a psychiatric ward. Regarding Kim's past medical history, the assessment reported Kim suffered a head injury with loss of consciousness in his late 30's following an assault.

### 5. *Dr. Yen's Declaration*

Dr. Yen was Kim's treating psychiatrist from March 17, 2017, through the time Dr. Yen submitted his declaration on January 7, 2020. Dr. Yen saw Kim bi-monthly, and a therapist saw Kim regularly. Dr. Yen explained Kim initially presented with auditory hallucination, grandiosity and paranoid delusion. Kim was diagnosed with schizophrenia, for which he was taking anti-psychotic medication and a mood stabilizer. Despite medication, Kim continued to experience psychotic symptoms at "an attenuated level." Dr. Yen said Kim was "unable to differentiate his thoughts that are psychotic versus the reality," had "limited understanding into his delusional beliefs and ma[de] poor judgment[s] and decisions based on impaired reality" and "continue[d] to function at a marginal level." Kim lived in a board and care facility, which supervised his medications and assisted with his daily needs.

### 6. *Toyama's Declaration*

Matthew Toyama is an immigration attorney. He reviewed Kim's criminal and immigration records. Kim obtained legal residency status, as a derivative of his parents, on February 22, 1979. Toyama explained Kim's conviction of section 245, subdivision (a)(1), was a crime of violence. Because Kim was sentenced to more than one year in prison, the conviction was also an aggravated felony under immigration law. Toyama explained that had Kim been convicted of two crimes of violence but sentenced to only 364 days for each crime, the convictions would not have been considered aggravated felonies under immigration law. Toyama explained Kim's conviction automatically disqualified him from asylum relief and from cancellation of removal available to certain legal permanent

residents.  Toyama concluded Kim's conviction barred him from any reasonable form of immigration relief, and if removal proceedings were initiated against Kim, he would be deported to South Korea.

D.    *The Hearing and Order Denying Kim's Motion To Vacate*

At the September 11, 2020 hearing, no live testimony was presented.  Kim's counsel argued Kim failed to meaningfully understand the immigration consequences of his plea, as evidenced by his mental state at the time of his plea and the confusion he expressed at his plea hearing about why he would be deported.  Kim's counsel also argued the judge who took the plea exacerbated Kim's confusion by saying Kim could argue against deportation to the immigration court, even though the conviction resulted in mandatory deportation.

The People did not file a written opposition, present any evidence or object to Kim's exhibits.  At the hearing, the People argued the judge who took the plea properly advised Kim of the immigration consequences of his plea and confirmed Kim spoke to his defense counsel about those consequences.  The People also argued defense counsel's notes indicated he went over the immigration consequences with Kim.  And the motion should be denied because "all the requirements of the law" had been met.

The trial court denied the motion without prejudice.[7]  The court found that the judge who took the plea "has taken probably thousands of pleas, was very clear with Mr. Kim," and that "[t]here was no confusion whatsoever."  The court explained that, because Kim had "the right under federal procedure to ask for a hearing in immigration court," the judge's statement that Kim

---

[7]    Judge Mildred Escobedo.

11

could argue against deportation in immigration court was "a correct statement of the law." The court said it was "absolutely incorrect" to argue the statement confused Kim, given the judge also told Kim that his conviction would lead to his deportation.

E.    *Kim's Motion for Reconsideration*

Approximately three weeks after the hearing, Kim moved to reconsider his motion to vacate. Although Kim did not present any new evidence, he urged the trial court to consider whether Kim's mental state affected his ability to meaningfully understand the immigration consequences of his plea and whether defense counsel erred in failing to request more time at the plea hearing when Kim expressed his confusion about the immigration consequences.

The People did not file an opposition.

Without a hearing or an appearance by the People, the court denied the motion with prejudice, noting its successive nature.

## DISCUSSION

Kim argues the trial court erred by not vacating his plea under section 1473.7 or, in the alternative, under section 1016.5. Because we agree with Kim on his first argument, we do not reach his second argument.

A.    *Penal Code Section 1473.7*

Under section 1473.7, subdivision (a)(1), a defendant may vacate a sentence or conviction if the defendant establishes a prejudicial error that prevented the defendant from understanding, defending against, or knowingly accepting the immigration consequences of the defendant's plea: "A person who is no longer in criminal custody may file a motion to vacate a

conviction or sentence . . . [¶] [because] [t]he conviction or sentence is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere."

A party seeking relief under section 1473.7, subdivision (a)(1), must make two showings: (1) an error "'damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences'" of the plea, and (2) prejudice.[8] (*People v. Vivar* (2021) 11 Cal.5th 510, 528 (*Vivar*).) The error need not be by the court or defense counsel but can be the defendant's own mistake. (*People v. Rodriguez* (2021) 68 Cal.App.5th 301, 321.) "[S]howing prejudicial error under section 1473.7, subdivision (a)(1) means demonstrating a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential immigration consequences. When courts assess whether a petitioner has shown that reasonable probability, they consider the totality of the circumstances." (*Vivar*, at pp. 529-530.) "Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated

---

[8] There are other requirements that must be met when moving to vacate a conviction under section 1473.7, subdivision (a)(1). (§ 1473.7, subds. (b)(2), (e)(1).) But we need not address those requirements in this case since they are not challenged and appear to have been met.

13

disposition was possible." (*Ibid.*)  The "key to the statute is the mindset of the defendant and what he or she understood—or didn't understand—at the time the plea was taken." (*People v. Mejia* (2019) 36 Cal.App.5th 859, 866 (*Mejia*).)

The moving party must establish a ground for relief by a preponderance of the evidence under section 1473.7.  (§ 1473.7, subd. (e)(1).)  "[W]hen a defendant seeks to withdraw a plea based on inadequate advisement of immigration consequences, we have long required the defendant corroborate such assertions with "'objective evidence.'""  (*Vivar*, *supra*, 11 Cal.5th at p. 530.)

"[T]he only finding that the court is required to make is whether the conviction is legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a plea of guilty or nolo contendere."  (§ 1473.7, subd. (e)(4).)

B.     *Standard of Review*

We review the denial of a section 1473.7 motion independently.  (*Vivar*, *supra*, 11 Cal.5th at pp. 524-525.)  "'[U]nder independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law.' [Citation.]  When courts engage in independent review, they should be mindful that "'[i]ndependent review is *not* the equivalent of de novo review.'""  (*Id.* at p. 527.)  The motion is reviewed independently because of "the history of section 1473.7, the interests at stake in a section 1473.7 motion, the type of evidence on which a section 1473.7 ruling is likely to be based, and the relative competence of trial courts and appellate courts to assess that evidence."  (*Ibid.*)

14

We need not defer to the trial court's findings when the evidence is documentary. When "the facts derive entirely from written declarations and other documents . . . there is no reason to conclude the trial court has the same special purchase on the question at issue; as a practical matter, '[t]he trial court and this court are in the same position in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding." (*Vivar, supra,* 11 Cal.5th at p. 528.)

C.     *Kim Established Error by a Preponderance of the Evidence*
        Kim contends he established multiple errors that damaged his ability to understand the immigration consequences of his plea, notwithstanding the trial court's advisements that the conviction would lead to his deportation.[9]
        We agree. Kim did not meaningfully understand or knowingly accept the immigration consequences of his plea.
        Most importantly, the record is clear Kim was confused about immigration consequences at the time of his plea.[10] Kim

---

[9]     On appeal Kim argues his defense counsel was ineffective for failing to seek an immigration-neutral plea or to pursue a plea of not guilty by reason of insanity. We do not address this purported error because Kim forfeited this argument by not raising it in the trial court. (See *Dumas v. Los Angeles County Bd. of Supervisors* (2020) 45 Cal.App.5th 348, 357 [failure to raise argument in trial court results in forfeiture on appeal].)

[10]    The undisputed evidence also demonstrates Kim appeared confused about what it meant to enter a no contest plea, including his statement to defense counsel that he wanted to enter a no contest plea and immediately appeal because he was not guilty.

said, "I'm a little unclear about all that. . . . I can't understand why I would be deported."

In addition, the court responded by suggesting Kim could take his argument up with the immigration authorities: "[T]hat's up to the immigration authorities. . . . If you want to argue with them you should be allowed to stay here you can make that argument but I don't have control over that." Although the court's comments were technically correct, Kim could have understood them to mean deportation may be avoidable if he made a persuasive argument against it. But deportation was not avoidable because Kim's conviction subjects him to mandatory deportation. At a minimum, the court's comments likely confused Kim even more.

Finally, it is uncontroverted Kim suffered from a mental illness at the time of his plea. He was diagnosed with schizophrenia in 1993. While in custody, and for months leading up to the day Kim entered his plea, his medical records documented the symptoms he experienced, including paranoia, audio and visual hallucinations and delusions. Kim's psychiatric evaluation confirmed that he had "a very significant underlying mental disorder" and reached the equivocal conclusion that he was "marginally competent to stand trial, and though his competency is less than optimal it is *probably* adequate to proceed." (Italics added.)

The People argue we should affirm the trial court's denial of Kim's motion because he failed to establish error. But their arguments are unpersuasive, addressing the evidence piecemeal rather than analyzing the totality of the circumstances.

The People contend Kim was "competent to enter a plea of no contest" because he was "competent to stand trial." But

irrespective of his competency, the record shows that at the time of his plea, Kim was confused about why he would be deported and likely more confused by the court's comments implying deportation might be avoidable. Kim's marginal competency and mental health issues did not clarify things but exacerbated the confusion.

The People also contend that the immigration advisements given by the court and defense counsel, and that Kim's affirmation he understood the advisements and had spoken with his counsel about the immigration consequences of his plea, are sufficient to deny the motion. But proper advisement under section 1016.5 is not a bar to relief under section 1473.7. (See *People v. Camacho* (2019) 32 Cal.App.5th 998, 1011, fn. 8 [a trial court's warning that deportation "*will* result" is not a bar to relief under section 1473.7].) Moreover, Kim's mental illness and marginal competence probably impaired his ability to meaningfully understand the advisement. This impairment is consistent with the fact that after his advisement and before his plea, Kim expressed confusion about deportation. The court's response suggesting deportation might be avoidable only made matters worse.

Finally, at oral argument, the People contended the fact that Kim was advised of mandatory deportation, expressed concern about deportation and pleaded anyway showed Kim understood and accepted deportation as a consequence of his plea. But after Kim expressed concern and before his plea, the court's comments intimated he might avoid deportation. And again, Kim was suffering from severe mental issues and was barely competent.

17

Having considered the totality of the circumstances, we conclude Kim met his burden of producing a preponderance of the evidence that an error likely occurred at the time of his plea impacting his ability to meaningfully understand and accept the immigration consequences of his plea.

D.  *Kim Established Prejudice by a Preponderance of the Evidence*

Kim contends the errors were prejudicial because there was a reasonable probability he would have rejected the plea if he had understood its actual consequences.

We agree.  The contemporaneous and overwhelming evidence corroborates Kim's position that there was a reasonable probability he would have rejected the plea had he meaningfully understood its immigration consequences.

At the time of his plea, Kim had been a legal permanent resident since 1979, living in the United States for over 30 years.  Avoiding deportation was on Kim's mind, and the trial court was aware of Kim's concern.  Kim initially declined a plea agreement and opted to go to trial because he was concerned about immigration consequences.

The risk of receiving a harsher sentence after trial was not high.  The court signaled to Kim that it believed there were "unusual circumstances" in the case, including Kim's lack of a prior record, his severe mental illness, and whether the incident would have occurred had the coffee shop owner and security guard "known the true situation" about Kim's circumstances.  The court told Kim that he faced up to seven years in prison if convicted by a jury but that the court would not necessarily sentence him to the maximum sentence.  In fact, the court indicated it would sentence Kim (and ultimately sentenced him)

18

to only two years in custody for a plea without a plea agreement. Kim could have reasonably believed he would not have received a much longer custodial sentence after trial unless the evidence was worse than the judge anticipated. Even if Kim received a longer custodial sentence, he likely would have served it in a psychiatric facility and not in state prison.

Further, Kim may have thought he could win at trial. The court said to Kim, "Of course you could win [at trial]," which Kim reasonably could have interpreted as an indication he could win at trial. Kim believed that he was innocent and acted in self-defense and that the security guard improperly acted beyond his authority in trying to arrest Kim.

Considering the totality of the circumstances and the evidence from Kim's perspective, we conclude a reasonable probability existed that he would not have pleaded no contest had he comprehended its immigration consequences. (*Mejia*, *supra*, 36 Cal.App.5th at pp. 872-873 [defendant established prejudice under section 1473.7 in part given defendant had no criminal record, the crime was "unsophisticated," and "it is simply not realistic to imagine that the court would have then imposed the maximum prison sentence" had defendant gone to trial]; see also *People v. Jung* (2020) 59 Cal.App.5th 842, 859, disapproved on other ground in *Vivar*, *supra*, 11 Cal.5th at p. 526, fn. 4 [the focus of inquiry regarding prejudicial error under section 1473.7 is the defendant's "mindset when pleading guilty"].)

19

**DISPOSITION**

We reverse the order denying Kim's motion to vacate under section 1473.7. The case is remanded to the trial court to grant the motion and allow Kim to withdraw his no contest plea.

IBARRA, J.[*]

We concur:

PERLUSS, P. J.

SEGAL, J.

---

[*] Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.